**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KIMBERLEY E. O'BRIEN,               )
                                    )
                    Plaintiff,      )
                                    )        Case No.  12-cv-1201
vs.                                 )
                                    )
KEVIN ANDERSON,                     )
                                    )

<u>**DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES**</u>
<u>**TO PLAINTIFF'S COMPLAINT AT LAW**</u>

NOW COMES Defendant, Kevin Anderson, by and through his attorneys, Schuyler, Roche & Crisham, P.C., and answers Plaintiff's Complaint at Law as follows:

**I.      <u>NATURE OF THE ACTION</u>**

This is a re-filing of a previous action as allowed by the Court's December 5, 2011 Order and seeks redress for Defendant's tortious and extreme physical and emotional abuse. Defendant tied up, beat, hit, whipped, sodomized, and psychologically abused Kim for the purpose of making her completely dependent upon him, isolating her from family and friends, and enslaving her. Plaintiff's Complaint alleges five counts against Defendant: (i) Intentional Infliction of Emotional Distress; (ii) False Imprisonment; (iii) Assault and Battery; (iv) Sexual Assault pursuant to Cal. Civ. Code § 1708.5; and (v) Negligence.

<u>**ANSWER**</u>**:    Defendant admits that this is a re-filing of a previous action and that Plaintiff's Complaint alleges five counts against Defendant.  Defend denies the remaining allegations set forth in this paragraph entitled "NATURE OF ACTION."**

1

## II.    PARTIES

1.      Plaintiff Kimberley E. O'Brien is a citizen and resident of the State of Illinois with her principal residence at 900 North Lake Shore Drive in Chicago, Illinois.

**ANSWER:    Defendant states that he has insufficient knowledge upon which to base a belief as to the truth or the falsity of the allegations contained in this paragraph and therefore denies all such allegations and demands strict proof thereof.**

2.      Defendant Kevin Anderson is a citizen of the State of Wisconsin with a principal residence located in Hudson, Wisconsin.  At various times material to this action, Defendant resided in Illinois and transacted business in the State of Illinois, within the County of Cook. Defendant has engaged in and continues to engage in many of the acts about which Plaintiff complains in the County of Cook, State of Illinois.

**ANSWER:    Defendant admits that he is a citizen of the State of Wisconsin with a principal residence located in Hudson, Wisconsin. Defendant denies the remaining allegations contained in this paragraph of this complaint.**

## III.    FACTUAL BACKGROUND

### A.    THE COURTSHIP AND THE FIRST INSTANCES OF DECEIT

3.      Kim first met the Defendant during a chance meeting at The Little Nell in Aspen, Colorado on February 3, 2000.  The parties spent hours talking and socializing.  At the time, Defendant informed Kim that he was not married and had no children.

**ANSWER:    Defendant admits that Defendant met Plaintiff in Aspen, Colorado in February 3, 2000 as Plaintiff was hired as an escort. Defendant denies the remaining allegations contained in this paragraph of this complaint.**

4.      Over the course of the next month-and-a half, Defendant called Kim on a nearly daily basis, occasionally leaving messages, but Kim did not answer because of her concerns about having a long-distance relationship.

**ANSWER:    Defendant admits he had some phone conversations with Plaintiff. Defendant denies the remaining allegations contained in this paragraph of this complaint.**

5.     Finally in approximately April 2000, Kim returned one of Defendant's calls and agreed to meet him in Chicago for the weekend.

**ANSWER:     Defendant admits that Plaintiff met Defendant in Chicago for an overnight where Plaintiff was a paid as an escort.  Defendant denies the remaining allegations contained in this paragraph of this complaint.**

6.     While in Chicago that weekend, Defendant took Kim to dinner, they went dancing, and Defendant showered Kim with lavish gifts.

**ANSWER:     Defendant admits that Plaintiff met Defendant in Chicago for an overnight where Plaintiff was paid as an escort, and Plaintiff and the Defendant went to dinner and dancing.  Defendant denies the remaining allegations contained in this paragraph of this complaint.**

7.     During that trip, the Parties spoke at length regarding their hopes and dreams for the future, and the Defendant told Kim that he wanted to make her dreams a reality.

**ANSWER:     Defendant admits that Plaintiff met Defendant in Chicago for an overnight where Plaintiff was paid as an escort.    Defendant denies the remaining allegations contained in this paragraph of this complaint.**

8.     During that conversation, Defendant bragged about his collection of rare coins. Defendant maintained the rare coin business through himself and his controlled alter-ego Christopher Napolitano for the purpose of accumulating significant undisclosed non-taxable wealth and has a collection valued in excess of $4,000,000.

**ANSWER:     Defendant denies the allegations contained in this paragraph of this complaint.**

9.     Defendant suggested that Kim take classes at the Gemological Institute of America in New York City so she could help diversify his rare coin business and offered to pay for the classes.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

10.     A few weeks later, Defendant invited Kim to join him in New York to experience a coin show with him.  Kim met Defendant in New York City where she began acquiring knowledge of the acquisition and sale of rare coins.  Defendant told her that she could contribute and join in his rare coin business venture.

**ANSWER**:     **Defendant admits that Plaintiff and Defendant have visited New York City. Defendant denies the remaining allegations contained in this paragraph of this complaint.**

11.     That trip began a whirlwind courtship where Defendant took Kim on three to five day weekend excursions every other week.  During those trips, Kim accompanied Defendant to places such as Aspen, New York, Montreal, Chicago and Atlanta for coin shows and leisure.

**ANSWER**:     **Defendant admits that Defendant and Plaintiff took some trips together. Defendant denies the remaining allegations contained in this paragraph of this complaint.**

12.     During that time period, Defendant also regularly made surprise visits to Kim's residence in Michigan and lavished Kim with expensive gifts, including approximately $10,000 worth of clothing from a boutique in New York City following their trip to the coin show.

**ANSWER**:     **Defendant admits that Defendant visited Plaintiff in Michigan and that he gave Plaintiff gifts on occasion.  Defendant denies the remaining allegations contained in this paragraph of this complaint.**

13.     Later that fall, in approximately November 2000, Kim met Defendant for a skiing vacation in Lake Tahoe.  During that Lake Tahoe trip, Kim learned that Defendant was still

married to his first wife, Linda Anderson, and had a child named Tyler. It was the first of many times that Defendant lied to her during their relationship.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

14. Upon learning that Defendant was married, Kim was devastated because she realized that she had fallen in love with a married man.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

15. Defendant poured on the charm, however, and pleaded with Kim that his prior marriage was effectively over and that finalizing the divorce was simply a formality as the divorce had been in progress for several years.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

16. Nevertheless, Kim and Defendant left Lake Tahoe on separate flights, and Kim expressed to Defendant that she needed to think about whether to continue seeing him.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

17. Defendant thereafter continued his efforts to woo Kim. Later that year, Defendant lured Kim back into committing to their relationship by giving Kim a promise ring on December 23, 2000 at a hotel in downtown Minneapolis.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

18.     Defendant claimed the ring represented his promise to become engaged to her as soon as his divorce to his first wife was final.

**ANSWER:     Defendant denies the allegations contained in this paragraph of this complaint.**

19.     Kim, who longed for a committed relationship with the Defendant, was overwhelmed by Defendant's gesture and agreed to continue their relationship.

**ANSWER:     Defendant denies the allegations contained in this paragraph of this complaint.**

20.     Over the course of the following months, Defendant resumed his whirlwind courtship of Kim, plying her with expensive gifts and trips to exotic locations.

**ANSWER:     Defendant denies the allegations contained in this paragraph of this complaint.**

21.     During that time period, Defendant updated Kim regularly regarding the progress of his divorce and assured her of his love for her.  At the time, Kim had never felt so safe or secure in a relationship.

**ANSWER:     Defendant denies the allegations contained in this paragraph of this complaint.**

**B.     DEFENDANT'S ADDICTION TO PORNOGRAPHY**

22.     Prior to meeting Kim, Defendant was already grappling with a serious addiction to pornography.  See Stephen A. Kosa's Report submitted in connection with Defendant's divorce to his first wife, a copy of which is attached hereto as Exhibit A.

**ANSWER:     Defendant denies the allegations contained in this paragraph of this complaint.**

23.     Prior to meeting Kim, Defendant was corresponding with people other than his wife on-line for the purpose of arranging group sex.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

24.     Defendant's addiction to pornography took a sinister turn as he began to indulge his fantasies of living a sadomasochistic lifestyle.

**ANSWER**:     **Defendant denies the allegations contained n this paragraph of this complaint.**

25.     Defendant admitted to visiting the website "Albany Power Exchange" to research various aspects of the sadomasochist lifestyle.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

26.     Defendant researched the following topics:

(a)     Rules governing and defining the master/slave relationship;
(b)     Guidelines for drafting a "slavery" contract;
(c)     Guidelines for how to perform an enima [sic] as punishment;
(d)     Definitions distinguishing a submissive partner from a slave and the levels of submission and dominance;
(e)     Advice on how to best restrain and collar a slave;
(f)     Guidelines on promiscuity of the master and how to address the submissive's jealousy; and
(g)     Guidelines for "breast bondage," spanking, and figging.

See Albany Power Exchange materials, copies of which are attached hereto as Exhibit B.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph (including subparagraphs (a) – (g) of this complaint.**

27.     Defendant answered an online check-list he printed from the website Iron-Rose.com detailing his levels of sexual stimulation related to certain activities including being highly stimulated by anal plugs, beatings, bondage, and fantasy rape.  See Submissive BDSM Play Partner Check List, a copy of which is attached hereto as Exhibit C.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

28.     In or about 2002, Defendant drafted a fantasy contract between himself and an individual named Elizabeth O, which combined Kim's middle name with the title character in a book about bondage that he read.  See Unsigned Slavery Contract, a copy of which is attached hereto as Exhibit D.  Defendant never showed Kim a copy of that contract.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

29.     Prior to the parties' marriage, Defendant never acted upon these fantasies with Kim, nor did he explain them to Kim.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

30.     Eventually, Defendant began to attempt to persuade Kim to refer to him as "Master" in their email conversations and began sending Kim sexually explicit emails.  Kim did not take Defendant's request seriously and believed he was joking, referring to his, at times, obstinate personality.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

31.     Unbeknownst to Kim, however, Defendant had a far more sinister scheme in mind as he secretly began hoarding sexual devices he intended to introduce into their relationship once married.  See Sexually explicit emails from Defendant to Kim, copies of which are attached hereto as Exhibit E; Photos of sexual toys purchased by Defendant during relationship, copies of which are attached hereto as Exhibit F.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

C.    **DEFENDANT'S MANIPULATION AND CONTROL OF PLAINTIFF**

32.    After spending New Year's Eve with Kim and her parents, Defendant proposed to Kim for the first time on January 2, 2002 at the Cookshop in Windsor, Ontario.  Kim refused to accept the ring because Defendant was still married at the time.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of this complaint.**

33.    Defendant convincingly acted as if he was heartbroken by Kim's refusal and spent the next nine months actively courting Kim in an effort to manipulate her into changing her mind, once again taking Kim on weekend trips and visiting Kim and her family in Michigan.

**ANSWER**:    **Defendant admits that Plaintiff and Defendant took some trips together. Defendant denies the remaining allegations in this paragraph of this complaint.**

34.    Then, on October 6, 2002, Defendant proposed again while the couple was at the Four Seasons in New York City.  Kim accepted the ring due to Defendant's deceitful assurances that his divorce had been finalized.  To substantiate his false claims, Defendant showed Kim what he claimed was a final decree of divorce from his first wife.  Kim did not learn until much later that the document did not evidence a final divorce.  (Defendant's divorce of his first wife did not actually become final until Spring 2004.)

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

35.    Now engaged to Kim, Defendant persuaded Kim to move to Minneapolis to join him, to quit her job, and to return to school at the Art Institute of Minnesota to pursue a degree in

interior design.  Defendant encouraged Kim to pursue the degree so she could help in renovating property ventures undertaken during the following three years.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

36.    Defendant's actual motive for convincing Kim to move, quit her job and return to school was solely to make Kim financially dependent upon Defendant and to remove Kim from the influence of her family and friends.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

37.    From October 2002 through December 2002, Kim settled her affairs in Michigan and prepared to move in with Defendant at his home near Minneapolis without any awareness that he was actually still married, including quitting her job and enrolling in school in Minneapolis.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

38.    Then, in December 2002, Kim learned that Defendant had lied about the divorce being final.  Defendant once again poured on the charm and convinced Kim that the divorce would be final just after the holiday and they could start their life together.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

39.    After spending the first part of 2003 concentrating on school, in or about August 2003, Kim and Defendant purchased a studio apartment at 900 North Lake Shore Drive, Chicago, Illinois.  They purchased the apartment as a business investment, consistent with their previous discussions concerning Kim using her design knowledge to assist in renovating property for investment purposes.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

40.     In the fall of 2003, Defendant coerced Kim to spend any time she was not attending design classes in the Chicago apartment to avoid being deposed in his divorce proceedings.  Kim expressed to Defendant that she was willing to be deposed and had nothing to hide, but Defendant insisted that she comply, once again pouring on the charm.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

41.     Kim unhappily consented to the arrangement and spent her time traveling back and forth between Chicago and Minneapolis until Defendant's divorce was finalized in or about March of 2004.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

 

      **D.**       **COVE ROAD AND THE FRAUDULENT QUITCLAIM DEED**

42.     Beginning in the summer of 2003 and continuing through summer of 2004, Kim and Defendant searched for a marital home in or near Hudson, Wisconsin, a city in the Minneapolis metropolitan area.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

 

43.     To contribute money toward the purchase of the property at 270 Cove Road in Hudson, Kim refinanced a townhouse in Michigan, extracting all of the equity, so that she could contribute money toward the purchase of the Cove Road home.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

44.     From the refinancing, Kim provided Defendant with $24,000 towards the purchase price of the Cove Road property with the express understanding that her name would appear on the mortgage and that she would have a 50% ownership interest.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

45.     When Kim delivered the $24,000 to Defendant, he lied and told Kim that the closing would take place on July 9, 2004 when it was actually scheduled for July 6, 2004.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

46.     Defendant misrepresented the closing date of the property to ensure that Kim would not be present to sign the mortgage at closing so that he could take the property solely in his name.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

47.     On July 6, 2004, Defendant signed the mortgage without Kim present.  Defendant let Kim know about his "mistake" as to the date only after it was too late for Kim to be present at the closing.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

48.     Kim expressed her dismay that her name did not appear on the title to the marital home, despite their engagement to marry and her $24,000 contribution.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

49.     At that time, Defendant scurrilously told Kim that she should get a lawyer if she wanted to name added to the mortgage in spite of his earlier protestations of it being an innocent omission.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

50.     Later that month, in July 2004, Kim and Defendant travelled to New York City for a coin show.  When they arrived at the hotel, there were three-dozen roses in vases on the table along with an apology note from Defendant.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

51.     Defendant also apologized profusely for signing the mortgage without her and showing her a notarized quitclaim deed purporting to add her name to the title on the Cove Road property.  See Cove Road Quitclaim Deed, a copy of which is attached hereto as Exhibit G.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

52.     Based on the Defendant's representations, Kim believed that the title and mortgage had been changed to reflect their mutual ownership in the property, and she accepted Defendant's apology and agreed to stay with Defendant at the Four Seasons in New York City for the next week for the coin show.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

53.     Unbeknownst to Kim, however, Defendant never caused the quitclaim deed to be filed or recorded.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

54.     In or about July 28, 2004, Defendant carried Kim across the threshold of what she believed would be their marital home at 270 Cove Road in Hudson, Wisconsin.  Kim and Defendant planned to marry in or about November 2004.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

### E.     PLAINTIFF BECOMES PREGNANT AND THE ABUSE BEGINS

55.     In August of 2004, while in Pittsburgh for another coin show, Kim learned that she and Defendant had conceived a child.

**ANSWER**:   **Defendant denies the allegations contained in this paragraph of the complaint.**

56.     Shortly thereafter, Defendant began verbally abusing Kim by disclaiming his paternity, threatening to cut Kim off financially, pressuring her to abort their child, and by calling her in words or substance a "fat piece of dirt."  He further claimed that he was already paying child support and that he was not going to let Kim use the child to "steal his money."

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

57.     Unbeknownst to Kim, Defendant also began visiting other women and escorts in other cities while on purported business trips.  Specifically, in October of 2004, Defendant corresponded with Valenti International for the purpose of engaging their services for $75,000 to set him up with a female companion.  See Valenti International Correspondence, copies of which are attached hereto as Exhibit H.

**ANSWER**: **Defendant admits that he corresponded with a company named Valenti International. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

58.     Every time Kim attempted to speak with Defendant about their pending nuptials and the baby, he became more abusive until once, in early October, he struck Kim across the top of the head and stood over her screaming at her to "quit her f***ing bawling." He continued to pressure her to get an abortion if she wanted to continue with their relationship.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

59.     Defendant postponed the wedding, which had been planned to take place in or about November 2004, and strung Kim along about rescheduling the wedding, vacillating daily about whether or not he was willing to accept their child.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

60.     In mid-November, after reaching an agreement that a small wedding would take place in Chicago just after Thanksgiving, Defendant called and issued Kim a final ultimatum "get an abortion or I'm not going to marry you."

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

61.     Kim was beyond devastated and cried hysterically for hours.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

62.     That night, Defendant called Kim after he was already supposed to be on the flight to Chicago and informed her that he missed his flight because of work, and that he would meet her in Chicago the following morning. The next morning he called a second time and

cancelled the trip altogether saying, in words or substance, "you know what you have to do or I won't marry you and you won't see me again," referring to the abortion.

**ANSWER**:   **Defendant denies the allegations contained in this paragraph of the complaint.**

63.     On the day after Thanksgiving (November 26, 2004), battered by Defendant's repeated abuses, deceptions and psychological manipulations, Kim proceeded with an abortion.

**ANSWER**:   **Defendant denies the allegations contained in this paragraph of the complaint.**

64.     During the first week of December, Defendant came to Chicago hoping to resume their relationship as if Kim had never become pregnant.

**ANSWER**:   **Defendant admits that he visited Chicago in the first week of December 2004. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

65.     Heartbroken over the loss of her child and that she had succumbed to Defendant's demands, Kim informed Defendant that she never wanted to see him again.  Defendant refused to stay away and repeatedly called and emailed Kim asking her to "stop blaming him for their baby's death," begging for forgiveness for his poor decisions, and pleading with Kim to take him back.  See Emails from Defendant to Kim, copies of which are attached hereto as Exhibit I.

**ANSWER**:   **Defendant denies the allegations contained in this paragraph of the complaint.**

66.     During that same timeframe, as soon as he knew Kim was no longer pregnant, Defendant contacted Valenti International and requested that they write an email claiming he had never contacted them.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

### F.     **DEFENDANT LURES PLAINTIFF BACK**

67.     In January 2005, Defendant asked Kim to reschedule their wedding for Valentine's Day in Santa Barbara.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

68.     Kim agreed, but solely upon the condition that Defendant, who had already cancelled the wedding before, would plan the wedding.  See Wedding Planning email, a copy of which is attached hereto as Exhibit J.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

69.     The wedding was planned to proceed in February of 2005, and they headed to Santa Barbara for the wedding.  However, Kim woke up on the morning of the scheduled wedding to find Defendant left behind an apology note on her bed stand explaining that he had left and would not be proceeding with the wedding.

**ANSWER**:     **Defendant admits that the parties were not married in February 2005. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

70.     Afterwards, Defendant contacted Kim and apologized for leaving her at the alter again.  In an effort to lure her back, Defendant offered to participate in couple's therapy if she took him back.  Defendant attended two sessions with Kim before he quit.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

71.     Shortly thereafter, Defendant surprised Kim at her church in Chicago and got down on one knee to propose.  Kim still loved the Defendant, in spite of his behavior, and agreed to give him one more chance.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**


G.      **THE PHYSICAL ABUSE DRAMATICALLY ESCALATES FOLLOWING THE PARTIES' MARRIAGE**

72.     On May 11, 2005, Kim and Defendant were finally married in Carmel, California.

**ANSWER**:     **Defendant admits the allegations contained in this paragraph of this complaint.**


73.     Each night during the first few days of their honeymoon, Defendant coaxed Kim into more adventurous sexual activities that he concocted.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**


74.     Caught up with the excitement of finally being married to the man that she loved, Kim indulged Defendant's requests.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

75.     On the fourth night of their honeymoon, Defendant sexually assaulted and sodomized Kim after knocking her unconscious.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

76.     That evening, Defendant started by expressing his desire to blindfold Kim so that he could "tease" her body with a feather.  Kim consented to being blindfolded.

**ANSWER**:     **Defendant admits that Plaintiff was blindfolded, but it was at her request and consent.  Defendant denies the remaining allegations contained in this paragraph of the complaint.**

77.     Once blindfolded, however, Defendant then punched Kim violently in the head causing her to lose consciousness.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

78.     Immediately thereafter, Defendant proceeded to bind Kim's arms and legs tightly and beat her severely with a whip.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

79.     Defendant then sodomized Kim with a large "plug."

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

80.     As Kim lay bound, gagged, battered, and sodomized, Defendant took humiliating pictures of Kim lying bound, battered, naked and helpless, all of which was done without Kim's knowledge or consent.  <u>See</u> Sexual Assault Photos, copies of which are attached hereto as Exhibit K.

**<u>ANSWER</u>:     Defendant admits taking pictures of the Plaintiff at her urging, with her knowledge and her consent.  The Defendant denies the remaining allegations contained in this paragraph of the complaint.**

81.     Defendant left Kim bound throughout the night in severe pain and against her will.  This episode four days into the marriage left whip marks on Kim's body.

**<u>ANSWER</u>:     Defendant denies the allegations contained in this paragraph of the complaint.**

82.     Upon awaking during the night while bound, gagged, beaten and sodomized, Kim begged and pleaded with Defendant to release her, but Defendant left her bound as he informed her of the new "rules of their relationship."

**<u>ANSWER</u>:     Defendant denies the allegations contained in this paragraph of the complaint.**

83.     When he finally released Kim the next morning, Defendant threatened her by saying in words or substance:

> ***"you will never tell anyone about this and if you're a good slave this will never happen again.  If you tell a single soul about this I will beat your face so badly that you will not recognize your own face in the mirror."***

**<u>ANSWER</u>:     Defendant denies the allegations contained in this paragraph of the complaint.**

84.     Once released, Defendant acted as if nothing had transpired to the point where it all felt like a bad dream.  Confused and in shock, Kim did not know how to even address what had occurred when Defendant later ordered her to pose for photographs to document the last day of their honeymoon.  Kim complied with his demands to smile for the camera.

**ANSWER**:     **Defendant admits that photographs were taken of the Plaintiff on the last day of their honeymoon at her urging, with her knowledge and consent. The Defendant further denies the other allegations contained in this paragraph of the complaint.**

85.     The next day, Defendant said in words or substance, that he liked seeing those marks all over her body because it showed that she "belonged" to him.  Defendant then informed Kim she was his slave and that he was her master.  He informed her that this Master/Slave arrangement was the lifestyle he expected from her going forward.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

86.     When they returned from their "honeymoon," Defendant demanded that Kim parade naked at all times when she was in the house and that if she was not naked when he arrived at home, she would be beaten.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

87.     Defendant struck Kim on several occasions.  Each time that Defendant hit Kim, he was careful not to leave visible marks on Kim's body that could be seen if Kim wore clothing.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

88.     As described in detail below, Defendant battered, pushed, tied up and falsely imprisoned Kim on numerous other occasions, all of which was without provocation or Kim's consent.  Defendant continued to torture, abuse and beat Kim throughout the summer of 2005 in a deliberate and calculated pattern of abuse followed by apologies and false promises.  On each occasion, the physical torture grew more vigorous and relentless until and unless Kim referred to Defendant as "Master."   The beatings became more frequent and occurred in California, Wisconsin, Illinois and elsewhere.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

### (1)    Defendant Admits He Has A Problem

89.     Two days after returning from their honeymoon, Kim discovered a stack of papers detailing Defendant's communications with adult dating services and a list of women he intended to meet on a shelf hidden behind the door to their home office.  See Dating Service communications, copies of which are attached hereto as Exhibit L.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

90.     Kim was horrified and devastated at discovering that Defendant had been actively soliciting other women to date while she was pregnant during their engagement.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

91.     Kim confronted Defendant about both the contract with Valenti and the list of women he intended to meet.  Defendant denied any wrongdoing and claimed that he never submitted the contract, but confronted with proof of his infidelity, Defendant eventually admitted that he had a problem.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

92.     Defendant, once again, plied Kim with promises that he would never let it happen again.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

93.     Defendant's feigned remorse was short-lived, and within a few weeks, he started disappearing for days at a time.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

94.     One day in mid-June, Kim became alarmed when Defendant failed to come home from work.  She frantically called his work cell phone over and over because she was worried that he might have been injured.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

95.     When Defendant finally returned home, he screamed at her for calling him at work and reminded her that he was her "Master" and that he could "come and go as he pleased."

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

96.     Defendant then dragged Kim downstairs into their home office, tied up her hands and feet with a length of rope, and beat her with a whip to remind her of "her place in their marriage."  The entire time he beat her, Defendant reminded her that it was her own fault she was being beaten because she had been a bad slave.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

97.     Defendant, once again, deliberately beat Kim in a way to ensure any marks would be to parts of Kim's body normally clothed.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

### (2)     Defendant Throws Plaintiff Over A Couch In New York City

98.     Later that month, while staying at the Grand Hyatt in New York City for a coin show, Defendant and Kim had a verbal disagreement that escalated into another physical assault when Defendant threw Kim over a sofa in their hotel room.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

99.     While Kim lay on the floor sobbing, Defendant came over and twisted her wrist back so hard that they heard a "pop" that caused Defendant to stop battering her.  Kim's wrist was still sore several months later.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

### (3)    Defendant Assaults Plaintiff On The Fourth Of July

100.    On the Fourth of July, Kim attended a party at Defendant's brother's house with Defendant and his son from his first marriage, Tyler.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

101.    That night, Defendant drank to excess while Kim shared copies of their wedding photos with the other guests, primarily Defendant's relatives.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

102.    At approximately midnight, Kim started repeatedly asking Defendant to take her and Tyler home.  Defendant refused to leave and eventually her requests started an argument.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

103.    Defendant finally took them home at approximately 1:30 a.m.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

104.    When they arrived home after dropping Tyler off at his mother's house, Defendant dragged Kim into their basement home office, and then, stripped Kim naked, tied her up, blindfolded her and beat her with a whip for the second time in less than a month.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

105. Kim begged Defendant to stop and struggled against her restraints.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of the complaint.**

106. Defendant refused and threatened to pour down Kim's through what Defendant claimed was another man's semen.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of the complaint.**

107. Kim continued to plead and beg to be released as she tried to avoid him pouring such liquid down her throat. Defendant then forced himself upon her sexually.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of the complaint.**

108. After he finished with her, Defendant left Kim bound on the floor overnight as a punishment for her complaints at the party.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of the complaint.**

109. Repeating his deliberate and calculated Jekyll and Hyde pattern, Defendant soon apologized for beating Kim and promised that it would never happen again. By that point, Kim had been so thoroughly abused and fearful that she lacked the power to leave or resist. See Post Fourth of July email, a copy of which is attached hereto as Exhibit M.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of the complaint.**

### (4)    **Plaintiff Finds Defendant's Pornography**

110.    For the next month-and-a half, Kim tried to spend as much time as possible in Chicago working with contractors, to rehabilitate the newly acquired Chicago property, trying to stay away from Defendant to avoid being attacked.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

111.    On August 24, 2005, Kim returned to the Cove Road house and started the computer to check her email.  Kim discovered that Defendant was still looking at pornography and having sexually-explicit conversations with other women in the Hudson-area, including communications purporting to arrange in-person sexual encounters.  See Adult Friend Finder webpage, a copy of which is attached hereto as Exhibit N; Internet History, a copy of which is attached hereto as Exhibit O.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

112.    Specifically, she observed an email communication between Defendant and a woman from a nearby town where Kevin asked the other woman "what can I do to you?" and the other woman's reply was "anything you want."

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

113.    At that point, Kim called Defendant at work to confront him about his infidelity. Defendant told her to wait for him and that he was coming home.  As she hung up the phone, Kim realized that she was about to be beaten again.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

114.    Instead of waiting to be beaten and assaulted, Kim went to the police to file a police report regarding Defendant's pattern of abusive behavior.  The police documented her complaint, but informed her nothing could be done since more than a month had passed since the last assault.  See August 24, 2005 Police Report, a copy of which is attached hereto as Exhibit P.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

### **(5)    Defendant Files For Divorce And The Abuse Continues**

115.    On or about August 25, 2005, and because Defendant learned that Kim went to the police, Defendant filed for divorce without telling Kim or serving her with any papers. Meanwhile, unbeknownst to Kim and at some time prior to serving her with divorce papers, Defendant had the Chicago apartment secretly gutted and rendered uninhabitable to ensure Kim had nowhere to go if she tried to leave him.  Instead, Defendant continued his pattern of verbally and physically abusing Kim and then apologizing for his behavior.

**ANSWER**:    **Defendant admits that he filed for divorce from Plaintiff.  Defendant denies the remaining allegations contained in this paragraph of the complaint.**

116.    Then, on September 21, 2005, Defendant took Kim into their home office to show Kim a website called Paingasm.com, which depicted women being tortured while men had sex with them.  Defendant also began keeping similarly themed videos around their house after

marrying Kim.  <u>See</u> Photos of Pornographic Movies, copies of which are attached hereto as Exhibit Q.

**<u>ANSWER</u>:  Defendant denies the allegations contained in this paragraph of the complaint.**

117.  When Kim expressed dismay as to what she saw on Paingasm.com, Defendant tied her up and whipped her on the floor of their home office.

**<u>ANSWER</u>:  Defendant denies the allegations contained in this paragraph of the complaint.**

### (6)  <u>Defendant Assaults Plaintiff And Is Arrested</u>

118.  Two days later, on September 23, 2005, Kim asked Defendant to approve some remodeling work on the Chicago apartment when Defendant lost his temper again.  He ripped her shirt, threw her across the room, and then while Kim was on the ground begging for mercy, Defendant yanked her up by her hair and back-handed her across the face.

**<u>ANSWER</u>:  Defendant denies the allegations contained in this paragraph of the complaint.**

119.  Kim fled to her bedroom until Defendant left for work and then went to the Hudson Police Department to file a report.  <u>See</u> September 23, 2005 Police Report, a copy of which is attached hereto as Exhibit R.

**<u>ANSWER</u>:  Defendant admits that Plaintiff filed a report with the St. Croix County Sheriff's Dept. based on the call that he received from the Sheriff's office that same day. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

120.    At that time and in a distraught state, Kim refused to have any pictures taken of the bruising and whip-marks all over her body because she was embarrassed to have a male officer inspecting her body.

**ANSWER**:    **Defendant denies that Plaintiff had bruising or whip-marks on her body caused by him. Defendant states that he has insufficient knowledge upon which to base a belief as to the truth or the falsity of the remaining allegations contained in this paragraph and therefore denies all such allegations and demands strict proof thereof.**

121.    Defendant's conduct and Kim's exhibited injuries were sufficiently extreme, however, that Defendant was placed under arrest for disorderly conduct and domestic battery later that day. At the time of his arrest, Defendant admitted to causing some of the injuries sustained by Kim, but claimed that he caused Kim injury in self-defense.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

122.    Upon being released from policy custody, Defendant returned home, and with a cold stare, informed Kim that he would get his payback and that she would never see what was coming her way.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

123.    On or about September 29, 2005, Defendant served Kim with (i) the divorce papers he previously secretly filed; and (ii) a restraining order containing false accusations of Kim physically abusing the Defendant during the course of the relationship, despite Defendant's much greater size and strength.

**ANSWER**:    **Defendant admits that on September 29, 2005, Plaintiff was served with divorce papers and a restraining order. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

124.    The restraining order also sought to have Kim ejected from their marital home. Defendant filed for the restraining order evicting Kim from the Cove Road property with the express intent of harassing Kim and leaving her without a place to live.

**ANSWER**:    **Defendant admits that the restraining order requested that Plaintiff leave the Cove Road property.   Defendant denies the remaining allegations contained in this paragraph of the complaint.**

125.    On or about September 30, 2005, Kim returned to the Hudson Police Department (i) to give a statement to a female officer regarding Defendant's most recent abuse; (ii) to document the injuries associated with that complaint; and (iii) to get a restraining order against Defendant.  See September 30, 2005 Police Report, a copy of which is attached hereto as Exhibit S.

**ANSWER**:    **Defendant admits that Plaintiff went to the St. Croix County Sheriff's Department on September 30, 2005, based on the report he later obtained.  Defendant denies the remaining allegations contained in this paragraph of the complaint.**

126.    At that time, Kim had pictures taken of the injuries to her wrist, but elected to have Deputy Hart document her other injuries in a written report to avoid the humiliation of other members of the Police Department in Hudson (a small town) observing photographs of her private parts

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of the complaint.**

**H.    DEFENDANT'S ONGOING PATTERN OF ABUSE**

127.    Even after serving Kim with divorce papers, Defendant continued to harass and terrorize Kim by repeatedly calling her, emailing her, breaking into her house, and threatening her.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

128.     Defendant's sole purpose for continuing to harass and talk Kim was to exacerbate the mental and emotional injuries which he already caused her during their five-year relationship.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**


### (1)     Defendant Breaks Into Cove Road

129.     Following the September 30, 2005 restraining order, Defendant was no longer allowed in the Cove Road house.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**


130.     On October 9, 2005, at approximately 2:30 a.m., Defendant entered the Cove Road house without Kim's permission, stayed for approximately five minutes, and called Kim a "fucking bitch" when she asked why he was there.  See October 9, 2005 Police Report, a copy of which is attached hereto as Exhibit T.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

131.     Defendant was drunk at the time he entered the premises and came for the sole purpose of harassing and intimidating Kim in retaliation for her previously having Defendant arrested.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

132.     The Hudson police responded to the location after Defendant had already left, but stopped Defendant in his vehicle approximately two blocks away from the Cove Road house and give Defendant a ride to his hotel after taking a statement from Kim.

**ANSWER**:     **Defendant admits that Defendant spoke to a St. Croix County deputy at Cove Road and Salishan Drive and that he received a ride from the deputy. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

### (2)     Defendant Threatens Plaintiff Over The Phone

133.     Less than a week later, on October 14, 2005, Defendant called Kim numerous times between the hours of 9:15 p.m. and 2:45 a.m. calling her sick in the head and threatening to "beat her ass" when he got a hold of her. See October 14, 2005 Police Report, a copy of which is attached hereto as Exhibit U.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

### (3)     Defendant Breaks Into The House And Has The Alarms Changed

134.     On October 19, 2005, the Hudson police responded to the Cove Road address when Kim arrived home and found that the doors and windows of the house were open and that the house's burglar alarm had been activated. See October 19, 2005, Police Report, a copy of which is attached hereto as Exhibit V.

**ANSWER**:     **Defendant admits that Plaintiff contacted the police on October 19, 2005, based on the deputy report that he later obtained. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

135.     Kim could not turn off the alarm because Defendant changed the security code while she was out of town.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

136.     Defendant ransacked the house and changed the security codes in a further effort to harass and terrorize Kim.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of the complaint.**

137.     When they responded to the alarm call, Defendant confronted the Hudson police outside the Cove Road residence, demanding to know whether Kim made further complaints and further terrorizing Kim by making her aware that he was watching her.

**ANSWER**:     **Defendant admits that he spoke with a St. Croix County deputy. Defendant denies the remaining allegations contained in this paragraph of the complaint.**

138.     On October 26, 2005, Defendant again triggered the silent alarm at the Cove Road residence while trying to break in to the Cove Road house. <u>See</u> October 26, 2005 Police Report, a copy of which is attached hereto as Exhibit W.

**ANSWER**:     **Defendant denies the allegations in this paragraph of this complaint.**

139.     Defendant purposefully triggered the alarm to further terrorize Kim and let her know he could break into her home and reach her anytime he wanted.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

                    **(4)     <u>Defendant Threatens To Kill Plaintiff</u>**

140.     On October 31, 2005, Kim went to Applebee's for dinner when Defendant accidentally "bumped into" Kim.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

141.     Defendant asked Kim to remain at Applebee's to discuss settling the divorce. He then proceeded to threaten and intimidate Kim regarding their ongoing divorce by questioning her spirituality, threatening to withhold support payments, and then threatening to kill Kim.

34

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

142. Kim then immediately fled the restaurant and called the police to file another complaint against Defendant. See October 31, 2005 Police Report a copy of which is attached as Exhibit X.

**ANSWER: Defendant admits that Plaintiff contacted the police on October 31, 2005 based on the report that he later obtained. Defendant denies the remaining allegations in this paragraph of this complaint.**

143. While making her criminal complaint, Defendant continued to harass Kim by repeatedly calling her cell phone to threaten her.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of the complaint.**

144. Later that night, Defendant was arrested.

**ANSWER**: **Defendant admits the allegations contained in this paragraph of this complaint.**

(5) **Plaintiff Seeks A Restraining Order**

145. On November 15, 2005, Kim obtained a restraining order against Defendant based upon a pattern of harassing behavior that occurred between October 28 and November 10, 2005. See November 15, 2005 Police Records, copies of which are attached hereto as Exhibit Y.

**ANSWER**: **Defendant admits that Plaintiff obtained a temporary restraining order on November 15, 2005 based on the report that he later received. Defendant denies the remaining allegations contained in this paragraph of this complaint.**

146. During that time period, Defendant stalked, called and threatened Kim nearly daily in an effort to continue to terrorize Kim and to punish her for having him arrested on domestic abuse charges.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

**(6)      Defendant Hires Private Investigators To Harass Plaintiff**

147.    Subsequent to filing for divorce, Defendant hired at least four private investigators, including Raymond DiPrima d/b/a DiPrima Investigators, to perform background investigation about Kim.

**ANSWER**:    **Defendant admits that Defendant retained the services of a private investigator.  Defendant denies the remaining allegations contained in this paragraph of this complaint.**

148.    During the course of those investigations and at Defendant's direction, the investigators engaged in a smear campaign of Kim's character in an effort to further harass and intimidate Kim, including but not limited to following Kim and harassing Kim's friends and family.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of this complaint.**

**(7)      Defendant's Continuing Mental Abuse**

149.    Defendant has continued to harass and mentally torture Kim even after their divorce was finalized by continuing to: talk her while in Chicago, "randomly" bumping into her at her church, breaking into her apartment to steal things, and calling and texting her to let her know he is watching her and to psychologically abuse her by reminding her of the sexual assaults that he had perpetrated upon her during their marriage.  See January 27, 2011 Occurrence Report, a copy of which is attached hereto as Exhibit Z.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of this complaint.**

## COUNT I
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

150.    Plaintiff repeats and incorporates by reference paragraphs 1-149 above as paragraph 150 of this Count I as if fully set forth herein.

**ANSWER**:    **Defendant incorporates by reference his answers to paragraphs 1-149 as his response to paragraph 150 of this complaint.**

151.    Defendant's conduct towards Plaintiff prior to, during and following their marriage when viewed in its entirety constituted a pattern of purposeful abuse that was both extremely and outrageous in nature.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of this complaint.**

152.    In acting in the manner described more fully herein *supra*, Defendant intended to inflict severe emotional distress upon Plaintiff.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of this complaint.**

153.    In acting in the manner described more fully herein *supra*, Defendant knew or should have known that there was a high probability that his conduct would inflict severe emotional distress upon Plaintiff.

**ANSWER**:    **Defendant denies the allegations contained in this paragraph of this complaint.**

154.    In acting in the manner described more fully herein *supra*, Defendant in fact caused and continues to cause Plaintiff severe emotional distress including but not limited to symptoms associated with post-traumatic stress disorder, battered wife syndrome and general distress suffered on a daily and nightly basis, severe anxiety attacks over the physically and emotionally abusive conduct which she has experienced, nightmares and panic attacks associated

with being forced to abort her unborn fetus to avoid the dire consequences with which she was threatened, an inability to carry on normal interpersonal and business relationships with others, and a general inability to live an emotionally healthy normal life.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

WHEREFORE, Plaintiff is not entitled to judgment against the Defendant, Kevin Anderson, in any amount whatsoever.

## COUNT II
## FALSE IMPRISONMENT

155. Plaintiff repeats and incorporates by reference paragraphs 1-149 above as paragraph 155 of this Count II as if fully set forth herein.

**ANSWER**: **Defendant incorporates by reference his answers to paragraphs 1-149 as his response to paragraph 155 of this complaint.**

156. At various points during their relationship as more fully laid out *supra*, Defendant unlawfully restrained Plaintiff's freedom of movement by confining her with ropes and by forcefully grabbing her wrists in a manner intended to restrain Plaintiff's freedom of movement.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

157. At various points during their relationship as more fully laid out *supra*, Defendant intended that his actions would restrain Plaintiff's freedom of movement.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

158. At all times relevant to the claims set forth herein, Defendant confinement of Plaintiff was done without Plaintiff's consent and without any other legal justification.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of this complaint.**

159.    At all times relevant to the claims set forth herein, Plaintiff lacked the capacity and/or reasonable means to escape while being held against her will by Defendant.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of this complaint.**

160.    As a result of Defendant's unlawful conduct, Plaintiff was held against her will for hours on end, was rendered incapable of defending herself against Defendant's other batteries which are laid out more fully *supra*, suffered mental anguish as a result of Defendant's actions and sustained physical pain and suffering associated with the restraints being administered too tightly.

**ANSWER**:  **Defendant denies the allegations contained in this paragraph of this complaint.**

WHEREFORE, Plaintiff is not entitled to judgment against the Defendant, Kevin Anderson, in any amount whatsoever.


### COUNT III
### ASSAULT AND BATTERY

161.    Plaintiff repeats and incorporates by reference paragraphs 1-149 above as paragraph 161 of this Count III as if fully set forth herein.

**ANSWER**:  **Defendant incorporates by reference his answers to paragraphs 1-149 as his response to paragraph 161 of this complaint.**

162.    At various point [sic] to, during and following their marriage as more fully laid out *supra*, Defendant knowingly engaged in conduct that placed Plaintiff in imminent fear of being subjected to a battery.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

163.    As a result of Defendant's conduct, Plaintiff lived and continues to live in constant fear and anxiety that Defendant will continue to perpetrate further batteries upon her person akin to the batteries described herein *supra*.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

164.    At various points prior to, during and following their marriage as more fully laid out *supra*, Defendant intentionally made contact with Plaintiff in an insulting and/or provoking manner.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

165.    At various points prior to, during and following their marriage as more fully laid out *supra*, Defendant intentionally made contact with Plaintiff in a manner which caused her bodily harm including but not limited to bruising, bleeding, swelling, and a rupture to her right breast implant.

**ANSWER**: **Defendant denies the allegations contained in this paragraph of this complaint.**

WHEREFORE, Plaintiff is not entitled to judgment against the Defendant, Kevin Anderson, in any amount whatsoever.


**COUNT IV**
**SEXUAL ASSAULT**

**Defendant has filed a Motion to Dismiss Count IV of this Complaint, which is currently pending before the Court. Accordingly, per the Court's order, Defendant is not answering Count IV at this time.**

## COUNT V
## <u>NEGLIGENCE</u>

172.     Plaintiff repeats and incorporates by reference paragraphs 1-171 above as

paragraph 172 of this Count V as if fully set forth herein.

**<u>ANSWER</u>:     Defendant incorporates by reference his answers to paragraphs 1-171 as his response to paragraph 172 of this complaint.**

173.     At all times relevant, Defendant assumed a duty of reasonable care towards

Plaintiff's body and her breast implants which he required her to obtain.

**<u>ANSWER</u>:     Defendant denies the allegations contained in this paragraph of this complaint.**

174.     At all times relevant, Defendant was aware of the existence of implants in

Plaintiff's body as he was present before, during and after the surgery and paid for the breast

augmentation himself

**<u>ANSWER</u>:     Defendant admits that he was aware of the existence of implants in Plaintiff's body.  Defendant denies the remaining allegations contained in this paragraph of this complaint.**

175.     Defendant knew that he had a duty to act reasonably in any physical contact

towards Plaintiff, including his actions toward her breasts.

**<u>ANSWER</u>:     Defendant denies the allegations contained in this paragraph of this complaint.**

176.     Defendant acted negligently in his treatment towards Plaintiff and her breast

implants when he repeatedly whipped her, leaving bruises that were documented by the Hudson

Police Department.

**<u>ANSWER</u>:     Defendant denies the allegations contained in this paragraph of this complaint.**

177.     As a proximate result of Defendant's negligent behavior towards Plaintiff' breast implants, he caused a rupture to her right breast implant, which was first discovered by Plaintiff in January of 2007 when her physician examined her right breast under ultrasound.  The rupture was not openly visible and did not place Plaintiff on notice of any damage at the time of the abuse about which Plaintiff complains.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

178.     Plaintiff has suffered direct and actual injury due to Defendant's negligent behavior towards her body, including towards her breast implants.

**ANSWER**:     **Defendant denies the allegations contained in this paragraph of this complaint.**

WHEREFORE, Plaintiff is not entitled to judgment against the Defendant, Kevin Anderson, in any amount whatsoever.

**AFFIRMATIVE DEFENSES**
**FIRST AFFIRMATIVE DEFENSE**

Any alleged physical and/or sexual contact between Plaintiff and Defendant was consensual and performed with the permission of and/or invitation from the plaintiff and the plaintiff assumed the risk of any alleged injuries or damages arising out of any such contact. Similarly, any alleged false imprisonment of the Plaintiff was consensual and performed with the permission of or invitation of the Plaintiff.

WHEREFORE, Defendant, Kevin Anderson, prays that this Court find in his favor and against the Plaintiff, Kimberley O'Brien, and for any additional relief deemed just and appropriate.

## SECOND AFFIRMATIVE DEFENSE

Any alleged claims for assault and battery against the Defendant should be barred because the Defendant was acting in self-defense at the time of the alleged assault and battery.

WHEREFORE, Defendant, Kevin Anderson, prays that this Court find in his favor and against the Plaintiff, Kimberley O'Brien, and for any additional relief deemed just and appropriate.

## THIRD AFFIRMATIVE DEFENSE

Any alleged claims for negligence should be barred or any damages reduced comparatively based upon Plaintiff's contributory negligence in causing her claimed injuries or damages because Plaintiff voluntarily engaged in the sexual activities set forth in her Complaint with the knowledge that she might be subject to injuries including injuries to her breast implants.

WHEREFORE, Defendant, Kevin Anderson, prays that this Court find in his favor and against the Plaintiff, Kimberley O'Brien, and for any additional relief deemed just and appropriate.

**Respectfully submitted,**

By:     /s/ Charles H. Cole
        Attorney for Kevin Anderson

Charles H. Cole
Richard Juarez
Margaret M. Fitzsimmons
SCHUYLER, ROCHE & CRISHAM, P.C.
130 East Randolph Street, Suite 3800
Chicago, Illinois  60601
(312) 565-2400

782472

43

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day May, 2012, a copy of the foregoing was sent via Pacer and Electronic Case Filing (CM/ECF) to all counsel of record.

By: /s/ Charles H. Cole

Charles H. Cole (ARDC# 0482285)
Richard J. Juarez (ARDC # 6211253)
Margaret M. Fitzsimmons (ARDC # 6292813)
SCHUYLER, ROCHE, & CRISHAM, PC
130 E. Randolph Street, Suite 3800
Chicago, IL 60601
(312) 565-2400
Email: ccole@srcattorneys.com
rjuarez@srcattorneys.com
mfitz@srcattorneys.com
Attorneys for Defendant Kevin Anderson